Our final case for argument today is 25-1373 112 Genesee Street versus the United States. Ms. Jansen, please proceed when you're ready. Good morning and may it please the court. The American Rescue Plan Act, which created the RRF, was an economic stimulus benefit program. It was designed to keep restaurants afloat during the pandemic when they would otherwise have shuttered. And the program did this by awarding grants to restaurants to support their ongoing operations throughout the COVID-19 pandemic. What plaintiffs seeks here is an award of one of those grants that it did not receive while the program was in operation. It wants a grant award outside of the program after the program has closed, after all awards have been made, after the funds that were set aside to fund the program have been expended, and after Congress finally rescinded the fund in 2023 and deobligated the government. What plaintiff wants here is grant money without any of the caveats or the strings attached that Congress specifically appropriated for that grant. Now, plaintiffs call this what they want, a money damage, so they can plead their way into the jurisdiction of the Court of Federal Claims. Isn't it a calculation that's based in part on the damage they suffered? I mean, isn't that how the amount of the grant is calculated? That is how the amount of the grant is calculated. That is not how the statutory program works. And a money mandating statute needs to identify within the statute itself the money mandate. So there had to be a way to measure how these... I think they point to the shall language, the two instances of shall, and they kind of analogize it to Maine community, right? Where the shall language as opposed to the argument. You want to confront that one directly? Sure. So shall language is found throughout a lot of statutes. It obligates the government to do a number of things. Shall pay language gets us closer to a money mandate, and in Maine community health, it was the shall pay language. Yeah, if you said shall pay, we probably wouldn't be here. So it doesn't. It says shall award and shall use. So, you know, that's kind of why we're here. Otherwise, this would be squarely within Maine community. Shall award a grant is not shall pay language, and it doesn't identify a class of individuals who are entitled to payment. What we had in Maine community health was very different statutory language. And as the court pointed out, the Congress there created a very rare money mandating obligation. You had a triple mandate, that the agency was to establish and administer a program, that it shall provide for payment to certain insurers, and it shall pay qualifying insurers. What if the provision said shall award grants to eligible entities that file, that apply on May 21, 2021? That still would likely not create the money mandate necessary to bring this claim within the court of federal claims. There's a lot. Because why? Because Congress did a lot of other things in this grant program to avoid waiving sovereign immunity and creating that individual right of action here. So Congress specifically said this program... I guess, just to put a finer point on it, would it get over your concern that the statute, in your view, didn't identify a particular class of people to receive such awards? It might identify a specific class of people, but that alone is not sufficient to create a money mandate. Because elsewhere, Congress limited its obligation to a certain amount of money that was going to be available until it was no longer available, and the obligation was therefore cabined. But it does other things as well. So the grant money can only be used during a specific period of time, and it can only be used for certain purposes, all of which go to supporting an ongoing business. And there's actually 11 enumerated uses that this money can be made. And it can only be spent during a three-year period. And so even if plaintiffs were able to get a grant now, they would have to return it to the government because you would be outside of the program and the permissible use of that award. Is that how money mandating statutes work? If they file their lawsuit in time, but then the fund runs out, then there's no more liability for the government under a money mandating statute? That's precisely what this court held twice in Greenlee and in Prairie County. There was a payment in lieu of taxes act, which created a money mandate to pay local governments for tax revenue that it did not receive because of federal funding or because of federal land. And at the same time, it also created a liability cap on that liability that tied the amount of money that could be paid to the availability of certain funds from an appropriation. Plaintiffs did not get their full refund that they were owed, and so they sued the Court of Federal Claims. And this court said you only get what is left in the fund. If the government has capped its liability, you don't get the difference. So that's precisely what Congress is empowered to do and what the law will support. So it is possible to create a money mandate and also cap the government's liability under that mandate. But we have neither in this case. What plaintiffs are seeking here and what they're really confusing is what they want to be a money judgment is actually their request to seek enforcement of the statute in their favor. That is not a money damage, and that is not a cause of action under which Tucker Act can support jurisdiction. You think it's an APA action. This should be brought in district court. I can't speak to what they're claiming here. It could be brought in district court, but there were a number of claims challenging this statute and specifically SBA's administration of the program in district court and a number of those. How in particular do you think NIH or Department of Education impact this, and why didn't we get a full 28-day letter from anybody at all in this case about them? Because I don't think there is any relevance to this case. I understand why you would think that. I'm hoping he has a different answer. But I mean, Department of Education was mainly on the express or implied contract portion of the Tucker Act. Is that what you're going to argue, or what is your argument about why they're not relevant? I'd like to hear it. Well, there wasn't any grants issued here to these plaintiffs, and so they're not trying to enforce the terms of the grant against the government. What they're trying to do is seek the award of grant in the form of a money damage, and that's not what is at issue elsewhere. So we don't have a grant. We have the request to receive a grant long after the grant program has ended. No, no. The request to receive a grant was timely. It wasn't long after the grant program ended. The request to receive a grant was filed with the SBA in order early in the process. I'm sorry, this lawsuit. So this lawsuit is dressed up as a claim for money damages, but what it actually is is a request for equitable relief to get relief under the statutory mandate. They want money. Pardon me? They want money. They want a grant. There is no just simple naked money judgment that SBA was issuing when the grant program was ongoing that would satisfy the program. So what they want here is money that came from a grant without any of the other caveats or strings that came attached to that grant money. Nobody... You're saying strings attached because you're trying to maybe analogize it to looming? I mean, I'm just trying to understand your argument in the context of the case law, right? There's Maine community. Tell me how this case is different from that. There's looming. Tell me how this case is similar to that. Help me ground what you're saying, which is quite ethereal, in the case law so I can understand where to put this. So it's different from Maine in a few respects. First, the statutory language is different. We don't have shall pay language like we did. You have shall language, and to be clear, the Supreme Court didn't focus on shall pay. It focused on shall. So they discussed a triple mandate, which is shall establish and administer, shall provide for payment, and shall pay. And the Supreme Court did clearly hold there that not every failure to perform an obligation creates a right to monetary relief. The first sign the statute imposed an obligation is this mandatory shall language. Unlike the word may, which implies discretion, the word shall usually connotes a requirement. So respectfully, yes, the statute said shall provide, shall establish, shall pay, but the Supreme Court honed in on the word shall, in particular, shall. Yes, and that was the first- Shall award and shall pay sound very similar to me. I'm having difficulty. Right. So in the first part of that opinion, they addressed the issue of whether or not there was even an obligation by the government, and that's where that shall language comes in. We're not disputing if there was an obligation by the government here to act. There was the mandate to award grants to eligible entities in the order they were received. Where the court in Maine addresses the money mandating part is later and specifically relies on the statutory shall pay language, and I'm looking at the court's opinion of 1329. At where? 1329. The court says here again, 1342's mandatory text is significant. Statutory shall pay language often reflects congressional intent to create both a right and a remedy under the Tucker Act. And then they go on to discuss- So you think there, is there a difference in your mind between shall pay and shall grant or shall award? Yes. What's the difference? Well, one is the payment of money, period, full stop. The other one is an award of a grant, which is very nuanced. To be clear, the shall pay language here was in the context of a grant statute, correct? It was in the, under Maine Community Health? Yeah, no. Oh, this is, no, this is the ACA. This is the risk for doors program. I mixed it up in my own brain. All right. So the shall pay you think is money and the shall grant, because it's a grant, which by the way also happens to be money, is different? Yes, it's different because it's money and then some. It's not unfettered money. And then some. All of the strings that come attached to this grant, which is that it had to be used in one of 11 ways. It could only be used during what ended up being a three-year period of time. The money had to be returned if eligible entities went out of business and didn't use up all their money. And if the money wasn't used in the covered period, that money also had to be returned. So it wasn't just an award of money. And more importantly, the statute doesn't explicitly give, I guess, access to money in the way that the statute in Maine Community Health did, which again was for insurers' losses under the risk for doors program. Well, I mean, this is to handle losses attributable to COVID for certain industries that are more susceptible to that, right? Not exactly. It was to keep restaurants in business and to keep them operating so they wouldn't go out of business while the pandemic continued. And the way they measured how much a business was impacted by the pandemic was by calculating, looking in reverse, how much revenue they had lost in the year preceding. So it was a revenue replacement program, not a loss compensation program. And the whole purpose was to keep restaurants afloat and to provide for their ongoing operations. So it was very much a forward-looking, in real-time program. And it was very much cabined to a specific period of time and a specific amount of money. And it's also premised on some backwards-looking harm in the sense that you had to prove as a restaurant that there was a loss of revenue in the prior year due to the pandemic. Well, there had to be a way to calculate how much grant money any entity could get. Right. And the amount, though, is tied to the amount that you lost in the prior year. Well, it had to be. In that sense, it's starting to look like, okay, you are in distress already. We know that. And we expect you'll be in distress for the coming year. But we know you're in distress already because you lost X amount of money in the prior year. And so we're going to give you right now that same amount of money that you just lost. Now, I understand that the money is going to be used in all these different ways for rent or payroll or other expenses to keep you afloat and keep the doors open. But it's all part of a continuing harm, I guess, that's all related to the pandemic. But it's rooted in giving money based on past harm, it seems like. Well, it's rooted in a loss of revenue. But that, again, is a measuring stick for how an entity has been impacted by the pandemic. It's hard to imagine any other way that the government could calculate the impact of the pandemic of an eligible entity without looking at the difference in revenue between pre-pandemic years and pandemic years. I guess what I'm trying to say is this feels like an in-between case in the sense that it's not really just about purely forward-looking expenditures, nor is it purely about just trying to make you whole for some past injury. It's something in between. And we've got this kind of ongoing crisis in the country that started the year before, but we fully expect to be suffering through for the next year or two. But what is different here is that the statute, and this is different than what we see in other money mandating statutes like Maine Community Health, is that the government is not responsible for this loss. It's not as though the government is saying, you know, you were entitled to something that we didn't give you. You have suffered a harm. In Maine Community Health, it was, we want insurers to participate in this government-sponsored exchange program, but don't worry, if you lose too much money, we'll pay you. By the same token, if you make too much money, you've got to pay us. This was a recognition of an economy in free fall and wanting to prop that economy up. This was not a loss that was identified specifically in the statute as requiring compensation, but... Does the compensation need to be due to government-caused harm in order for a statute to be money mandating? I'm not aware of any rule that says that, but the case law where a money mandate has been found has been tied to some sort of governmental action where we have instead things that look like grant programs here, like in Lume and in National Center. Sorry, that's not a grant. Oh, it is a grant program, which have not been found to be money mandating. Those are, you know, where the government acts as a steward or acts to further a certain policy interest and gives out money for some, you know, policy reason. And those cases, because of all of the different stipulations that are put on grant awards and the ways in which the government's obligation gets cabined have not been found to be money mandating. And I think the reason for that is pretty clear. This isn't just a handout. This isn't just an award for which someone can later claim that they have an individual right of action. I mean, were they not entitled to the money? I saw Judge Hertling's opinion expressly indicated the government didn't dispute that they were entitled to the money. Am I wrong in remembering that? So the government doesn't dispute that SBA processed applicants in the order, or I'm sorry, they awarded grants in the order in which applications were processed and not in the order in which applications were received. So that was a difference from what the statutory mandate laid out. They argue or allege that they would have been a recipient and would have gotten some certain had you processed it according to the rubric in the statute which indicate in the order filed as opposed to the order processed. Did the government dispute that? We have no way of knowing that unless we take all 3,000 and some applicants, put them back into the pool, reorder them according... I didn't ask you whether you had a way of knowing it. I asked you if you disputed it. It's a different question. I don't think we conceded that. We don't concede that. I didn't ask you if you conceded it. I asked if you disputed it. Well, at this point, we would dispute that because we don't know. I didn't ask if you would like to dispute it now. I'm not offering a buffet. I asked if you disputed it before at the time when they made the allegation. This is part of a complaint. Did you dispute it? I don't know if we disputed that factual allegation specifically. Okay, all right. Okay, well, I'll restore some of your rebuttal time. Let's go ahead and hear from Mr. McLeod. Thank you, Chief Judge Moore. And may it please the Court, Charles McLeod of Williams & Connolly on behalf of plaintiffs. In Section 9009C, Congress mandated that SBA, quote, shall award grants to eligible entities in the order in which applications are received. That language does not mean that SBA may award grants if it feels like it in whatever order it chooses. SBA's failure to comply with Congress's clear mandate gives rise to a classic suit for Tucker Act damages that can be heard in the Court of Federal Claims. I'd like to start with a discussion that Chief Judge Moore... I'm sorry, Mr. McLeod. Did the statute give the SBA administrator some discretion even within the order in which people applied to pick more of these and less of those? There was a period initially when applications were first received where Congress set out priority applicants. These were disadvantaged applicants, racial and gender priority for those individuals. But after that priority period, applications were required to be processed in the order in which they were received. And there was no discretion to pick and choose and decide based on processing time instead of the application order. The government did make the argument below that order in which they were received meant the order in which they were processed. They did not renew that argument on appeal. So turning to the discussion that Chief Judge Moore was having with my colleague about whether there's a meaningful difference between shall paying and shall award grants, we think that there is no difference. Chief Judge Moore, as you pointed out... What about addressing her point, which is quite salient, that Maine community involves recouping damages, sort of a backward-looking thing. It's all about damages. You just get the money and you walk away. Whereas these other, Bowen or Lume, these are grant cases where the government in its benevolence in a paternalistic fashion is going to give people money for things, money it's not obligated to give them. How ought I to think about that difference in deciding whether this is money mandating? So I think the relevant difference is how do the grants look? So in Lume and in National Center, these were cooperative grants where the government was an active partner in the spending of the money. So my colleague is correct that in Lume, for example, it was not just a naked money judgment. That's why this court said in Lume, the only relief that would be meaningful is injunctive relief, because you need to not only get the money, but you need the government's assistance to spend the money on the tribal housing that was at issue there. The same thing was true in National Center, where the government, again, was an active participant in the research programs that were supposed to be funded using those grants. That's very different than this case. This case involves a program where the grants are firmly rooted in a backwards-looking injury. As Judge Chen pointed out, it is- Well, the amount of the grant is, but how you can spend it is not. It's not simply compensation for that backward-looking injury. The government has also narrowed the ways in which you can utilize the grant in a forward-looking way. And that's true. I think Judge Chen was right that this feels a little more hybrid. I think it is a little bit different in that sense, but I don't think that's a meaningful distinction. And the reason is, the government is not attaching strings in the same sense as LUMIE or National Center. In other words, the government is not checking in to make sure that you're only using the money for those particular expenditures. I think the reason they included- The fact that they're not overseeing doesn't mean that there aren't limits. I mean, the fact that you could get away with not using the money appropriately isn't sort of an answer, right? The government did impose limits on exactly what you could use the money for. And in fact, if those expenses exceeded in the future year, the amount you were given to compensate for sort of past damage, then you had to give the money back. That's true. And the reason I raised the government oversight is because, again, that's different from National Center and LUMIE, where you needed injunctive relief. You needed an order that said, government official, you do X, you do Y that the plaintiff wants in order to get complete relief for the plaintiff. That is not true in this case. We would be perfectly fine with a naked money judgment and that would rectify- You know what? All of our duties. I don't know who says the government says that. Yeah. Let me ask it this way. Is there a case that you're aware of that said that a particular statute granting money was money mandating, even though the statute said, this money I'm about to give you, you can only spend it on X or Y or Z. And after the end of a period of time, if you haven't spent all the money I just gave you, you got to give it back to me. So that's Maine. In Maine, the money was intended to compensate for losses from the risk corridor program. But that's the backward looking compensation for a loss you incurred for engaging in this program. Here, we're left with a situation where the government is giving the restaurants money, but also regulating how they can use that money they're about to give the restaurant. The restaurant can only pay rent or payroll or something like that. Now, I'm looking for a case that says, hey, I'm giving you money, and you can only spend it on very certain itemized things. And yet, the court said that's money mandating. So that was the point I was going to make about Maine, Your Honor, is in Maine, the money was intended for this backward looking purpose. And there were regular audits to ensure that the money was being used for that purpose. And if you didn't use it for that purpose, or you, in fact, didn't need as much money as the government had given you, the government could plow that money back. The other case I'd point to on that is Starkway. What was the purpose that you're referring to in Maine, that the money that was being paid to these insurers, they could only use it for a particular purpose? It was to compensate for losses from the risk corridors program. And that was really central to the dispute in Maine and the argument that the government was making, which was you really, you had no entitlement to this money because you made a bet. You made a bet that your offering of this program would make you money. It turned out not to make money. Justice Alito endorsed that position in his dissenting opinion. But the Supreme Court majority, a justice majority, said that by using this sort of mandatory shall language and by focusing on compensating for a backwards looking injury, Congress had created a money maintenance statute. And that's why I think it's so significant that this statute comes about a year after Maine. Maine is basically a roadmap for how not to create a money maintenance statute. And yet Congress here used a very similar triple mandate, used the shall language. And as Chief Judge Moore noted, Congress did something very different in other provisions that were related. So section 9009A, which is grants for entertainment venue operators, uses discretionary may award language and has a very different structure. So I think this was an intentional decision by Congress to create an entitlement to these funds. And our claim is based on the failure of SBA, which is conceded for purposes of the appeal. SBA's failure to comply with that mandate to give out the money in the order in which the funds were supposed to be given. That's the nub of the issue and that's why we're entitled to a damages remand. Related to my prior question, why isn't this forward looking statute in the sense that the government is trying to help subsidize your future expenditures in running the restaurant? So I don't think that that's factually right, in part because of the definition of covered periods. So covered period included not only forward looking periods, but also all the way back to February of 2020. So you could use this money to pay past expenses. It's just a matter of the way the statute worked. I think the reason that they included some forward looking period is because there was uncertainty about what the impact of the pandemic would be going forward. As Your Honor noted, it was sort of an ongoing emergency. But that is not something that would take this out of the money mandate in context. In fact, this Court's decision in Starglow is pretty similar. There was a- What was in the statute that you could use this money for past payroll or past rent? So if you look at 9009CA3, the definition of covered period, says that the covered period means the period beginning on February 15th of 2020 and ending December of 2021 or a date that's later determined by the administrator. And the administrator later determined it would go further. But then when you look at the use of funds, so this would be- It says during the covered period. During the covered period. So you could use it for expenses that you had incurred even prior to the program coming into existence. And the other thing I would note, and Your Honor's earlier questions alluded to this, is by definition, these were pandemic related revenue losses. This is A7, the definition of revenue losses. And they are based on your differences in revenue between 2020 and 2019. Now, my colleagues suggested that, well, it was impossible for the government to do any sort of subsidy going forward. I don't think that's true. The government could have simply said, we're going to make a pot of money available to help cover your expenses. And you submit applications and we'll decide how much we would want to give us. That would be more like a traditional grant program, like in LUMIE, where it's all about subsidizing your future expenditures. Yeah, but LUMIE and Bowen, the grant cases don't ever result in a finding of money mandating. I think it's because of the particular features of those cases. So in many of those cases- Or it could be that opposing counsel was onto something when she argued that there has to be a government related harm for there to be damages. That when the government is acting benevolent and giving gifts, which is what they're doing here, they have no obligation to give this money. That doesn't trigger money mandating. And that's because in many cases, grant programs are structured as a may award rather than a shall award. And so if it isn't- I understand, but get to the heart of her argument, which is that the government is awarding money in its benevolence. It's like the parable from the Bible about the people who worked a full day and the people who worked a half day and they all got paid the same amount, right? And the idea was, I'm giving you money in exchange for this. It's a fair deal here. It's a gift. This is a gift by the government. The government is granting people this money. There's no quid pro quo. The difference here is Congress used shall language. So it said, if you are an eligible entity and you submit a qualifying application, you are entitled to the money. And as the Supreme Court said in Maine, that sort of shall language creates not only a presumption of a right, but also a presumption of a remedy in the Tucker Act. And that's why the shall language is critical and distinguishes a lot of the cases that my colleague was talking about. The other thing I would say is there has not been, as far as I have seen, in the Supreme Court's cases or this Court's cases, a requirement of harm coming from the government. So you have cases like Starglow. I agree where it hasn't been. I 100% agree. But isn't it a nice thing to kind of latch onto as a helpfully divining principle in this otherwise somewhat confusing area of jurisprudence? I don't think so, Your Honor. I think that would actually introduce confusion into the law because there have been cases like Starglow where the government does something beneficial. So in that case, there was a pandemic related to fruit in Florida. Citrus grows were dying. And the federal government, out of its own beneficence, said we shall compensate you for losses related to that pandemic that the government didn't cause. Nevertheless, the court found that language to be money-maintaining. So that would be, I think, a sea change. So I am at my house standing at my front door. And I say, the first 10 people who come to my front door, I'm giving you $2,000. I can only give it to the first 10 people because I've only got $10,000 to give out, right? And I didn't notice this one small person standing kind of behind someone else. So I gave out the money to everybody. Does that person have a cause of action against me for not giving him $1,000? That would turn on questions of contract law. I think you might actually have a contract-based claim. OK, but this is not a contract-based case, Your Honor. Well, yeah. I mean, the reason I bring up contract law is because another thing I was going to say is many of these grant program cases are enforced based on the contract. I know, they go down under expressorate. Exactly. That's NIH and Department of Health.  So why didn't you cite either of those to us? Is it just because they were entirely under the contract provision? That's why. Because you saw, obviously, Justice Jackson's dissent in the recent NIH case. You couldn't miss that. I did read that opinion. We thought that because they were contract-related cases, they were not exactly on point and controlling. I do think it is interesting that nine justices of the Supreme Court apparently agree that grant-related programs can be the basis for a Tucker Act claim. I mean, there was disagreement about how you structure it. But is it under the contract provision, as opposed to the separate notion that the statute itself creates a right? Well, I think this gets to the point that your honor was alluding to earlier, which is the government enters into contracts that it doesn't have to enter into all the time. And so if the question is simply- But once it's entered that contract, it's obligated itself. And that was exactly the- That's the question. But when we pull back a layer, when it's just sort of throwing out there the opportunity to be receiving a grant, it hasn't actually entered a contract with an individual yet. And that was Justice Alito's dissenting argument in Maine. Justice Alito said in Maine, well, this was just a bet that these companies made. And we really should be cracking down on these implied rights of action when they don't involve a contract. We shouldn't be looking to statutory language to create government obligations. And Justice Sotomayor's majority opinion points out that statutorily implied obligations are a longstanding feature of Tucker Act jurisprudence, both in the Supreme Court and in this Court. And so we are not asking the Court to break any new ground in that respect. We're simply asking the Court to apply Maine and to apply other precedents that have looked to a wide variety of different statutory terms, things like shall compensate, shall allocate, shall be entitled to, and found that language to be money-mandating. And we don't see any significant difference between the language here and the language in those provisions. And I will say, I was surprised to hear my colleague make that argument because we did litigate that question below of whether shall award grants was fundamentally different and categorically disqualifying. And the government conceded below that they were not going to advance that argument, that it was not correct. That's Joint Appendix 175, footnote 6 of the government's reply, where they acknowledged that based on a series of cases from the Court of Federal Claims, they were not going to advance any argument that shall award grants was categorically not money-mandating. They said that was not a correct interpretation of law. So we think that they were right below. And again, like I said, I'm surprised to hear them make that argument again on appeal. But we think that they got it right the first time. Can you get to the statutory cap issue? I'm a little concerned. I'm actually more than a little concerned. I'm not sure what to do with it. The statute appears to say, give a particular amount of money for the fund. And then it also says, in addition to amounts otherwise available. Why doesn't that phrase just mean, should Congress choose to add additional amounts? It will. But if it doesn't, then the $28 billion is all this fund gets. And therefore, at this point, unfortunately, your claims are mooted. So a couple of responses. First is, as you suggested, we think that that amounts otherwise available language indicates that Congress did not intend for there to be a cap. Congress contemplated that there could be other funds. It might be appropriated funds. But it might also be funds that SBA has available as a general matter to make these payments. I think that the tense of that provision is interesting. If Congress had simply wanted to say, and we might top up the appropriation later, they could have said, in addition to amounts that will otherwise be made available or something to that effect. The fact that they used a present tense suggests that they were thinking of existing funds at the time. So then, in your view, would there need to be discovery or something like that to try to figure out whether any such funds in SBA were indeed available? I don't think so. Because the government has never taken the position that there were other funds that were available to it. It has taken the view that it's limited to the $28.6 billion. Which leads to my backup argument, which is, even if you think that it's capped at $28.6 billion, it is a longstanding principle of appropriations law the government misspending some amount of the appropriation does not eliminate the obligation. So this goes back to the Supreme Court's decision in Sutton. The GAO Red Book codifies this. Aren't there other cases, though, where there was a certain cap clearly set forth in the statute and that was the end of it? Yes. So Greenlee County is a perfect example of that. And the reason that the claim in Greenlee County failed is Congress said, distribute money according to this formula, subject to available appropriations. And Congress was clear that it didn't want to appropriate any more money. And what this court said was, the government complied with that obligation. The government gave out all of the money into the appropriate people, completely consistent with the statute. Here, our claim is they gave out the money, but they messed up in the way that they were doing it. They did not comply with the statute. And that's what distinguishes us from Greenlee County. So could you say that one more time? Sure. Because it sounds like in Greenlee, you know, the plaintiffs were blocked from accessing the judgment fund. Here, you think that's not true, even though both statutory provisions set out a particular amount of money. That's right. My point is, in Greenlee County, there was no statutory violation at all. The directive that Congress had was, use the formula, but you only have to give out as much money as you had. And Congress did that. They gave out all of the money that Congress had given to them. Here, SBA gave out money, but it did not comply with the additional statutory directive to give out the money in the order in which applications were received. That's what gives rise to our claim on the merits, the conceded violation of that statutory directive. And that's what distinguishes this case from a case like Greenlee County. But I think the easiest way to resolve this issue, Your Honor, and I see I'm over my time, I finished the answer, is simply to say that the amounts otherwise available language is the opposite of what Congress would have said if they wanted the sort of cap that's discussed in Greenlee County. In Greenlee County, they said, amounts available as appropriated. Here, Congress is intentionally trying to expand the pool of funds that would be available. All right. Thank you, Mr. McLeod.  Ms. Jansen. Thank you, Your Honor. And I would just like to start where my colleague left off on the capping language. In fact, in Maine Community Health, language, just like what we see here in the RRF, was cited as an example of how Congress could have capped their obligation, but did not do so in Maine Community Health. So in footnote number seven, the Supreme Court pointed to language where government contributions would be made from an appropriations account, or designated fund would consist of amounts appropriated and any other amounts that the fund may receive as examples of how Congress could have capped its liability and limited its obligations, but did not do so. Here, the language is nearly identical and gets us to the same outcome, which is in addition to funds otherwise available, there will be appropriated $28 billion in money available until expended. That is a clear cap on liability, as the Supreme Court contemplated in Maine Community Health. I'd also like to address the use of the funds here in the oversight. My colleague referred to the different uses to which these funds could be made, and that that wouldn't necessarily require any kind of oversight and doesn't take us out of Tucker Act jurisdiction. But what is absent here is the period of time during which these funds had to be used was limited and cabined to February 2022 up until March of 2023. That period has expired. There is no way the Court of Federal Claims could offer relief consistent with the statute that would allow these plaintiffs to receive money and use the money as appropriated or as contemplated consistent with the statutory mandate, because that time period has passed. Finally, the grant cases that we talked about, Loomian National Center, regardless of the language that was used in those statutes, the Court didn't ground its holding on the statutory language, but rather looked to the true nature of the claim that was being made and found that what plaintiffs wanted here or what plaintiffs were really after was not a money judgment, but an award of a grant that would happen to involve the release of money. And those are two different types of relief that are being sought. Only one is susceptible to Tucker Act jurisdiction, and the grant, seeking a grant award is not. That's a request for equitable relief. So if there are no further questions, respectfully, we ask this Court to reverse the trial court's decision. Thank you. Thank both counsel. The case is taken under submission.